The last case of this morning, Heeter v. Honeywell International, Inc. et al., No. 16-2395. Mr. Yanov, and Mr. Ebelin, and Ms. Lee. I'm Dave Yanov from the Beasley firm for the plaintiff appellant, Julie Heeter. Individually and on behalf of her late son, Brian. If I may reserve two minutes for a short cut. Sure. Thank you. This is obviously the classic Paul's graph type of case. Yes, Your Honor. We're all remembering our law school. As the court knows, our amended complaint was dismissed on the basis that the cause cannot be established in this case as a matter of law. Our position that reversal is necessary is laid out thoroughly. Just for the second, let's go back to 1928. In Paul's graph, you've got two persons trying to get onto a train, holding a newspaper. Unbeknownst to the guards who one pushed on, one was pulling on, the person who got onto the train before the doors closed, they didn't know that there were firecrackers in there. There were actually fairly intense firecrackers. They fell, they hit the tracks, they exploded. And down the way, there was a balance or a weight measuring device that fell and hit Ms. Paul's graph in the head. That happened immediately. And the court said, albeit 4-3, that, hey, at some point we have to stop it as a matter of policy here. And it just isn't enough to show that, yes, there was cause, but it wasn't proximate cause. Here we've got 15 hours. How do you bridge that gap here? Well, first, I'm very impressed with Your Honor's recollection of Paul's graph. I think it's just beating to you in law school, I guess. I want to move to the facts, but to answer Your Honor's question, which is actually one of the last things, is there wasn't 15 hours. There was no lapse of time at all. This was a continuous failure to notify that continued to and through the time of the shooting. What about intervening causes? In other words, it was 15 hours from the burglary to the homicide. Correct. And in between they had a conversation, I'm assuming at the deceased's home. Correct. About eight hours after the burglary. Correct. And then several hours later was the homicide. That's correct, Your Honor. That was about a 20-minute drive, I understand, from point A to point B. Also correct, Your Honor. This is proximate cause? Yeah. So if I can just step back for a minute. So I don't want to belabor all the facts, but among the critical things that we do know for present purposes are these. I'm just going to briefly go through five of them, if I may. Ms. Heater was very clear about what she wanted from an alarm security system for the family's Pocono home and why. Some dangerous characters she believed had left the area were back, specifically including C.J. Chattin, who she feared in fact posed a danger to the family and particularly to Brian. And she wanted her system to immediately alert her of any intrusion. That's one. Two, it's also very clear that this was what was promised by the ADT Honeywell system installed there, that she would be immediately alerted of any intrusion or even interruption of service 24-7, not only by ADT but also directly on her cell phone. Three, we also know that the promised notifications never came in any form, not only immediately when Chattin did break in and stole heirloom firearms and Chattin killed Brian's cat, not when he left lethally armed, not for the many ensuing hours, and I think this goes back to your Honor's question, when the many ensuing hours before he made his way to Brian and still later Chattin killed him and not even afterwards. And critically, finally, we also know what would have happened had any of those notifications been forthcoming. As soon as the burglary was discovered the next day, Ms. Heater told the police without hesitation that she suspected Chattin and given detailed information for his apprehension while also continually calling Brian to alert him of the danger, not knowing it was too late. And that is exactly what would have happened had she been notified as promised, had she received any of the notifications promised throughout those many hours before the shooting. Chattin would have been arrested, Brian alerted, and the tragedy averted. So I think the proximate cause is very clear. The defendants repeatedly stress that the resulting harm didn't occur on the alarm premises but at another location, Brian's apartment, which your Honor also brought up. But that's no more determinative here as a matter of law than it was, for example, in the Pennsylvania Supreme Court's Anderson decision we discussed in our primary brief, that the plaintiff pedestrian there was struck by the stolen car off the premises of the lot where it was stolen. The case law is that these sorts of issues are not determined by arbitrary line drawing, locational or temporal, but present questions that generally are for a jury. And in that regard, the defendants devote much of their argument to providing an argument that we do not make, that proximate cause may never be decided as a matter of law. Again, with the case law, including the Pennsylvania Supreme Court's de Timo decision, which was cited by the district court and by defendants, what the law instructs is this is generally so. But of course, it may be decided as a matter of law where a jury could not reasonably differ. Is it your position that the appropriate causation standard is found in Section 323 of the Restatement Second of Torts? Well, the appropriate causation standard is that repeatedly pronounced by the Pennsylvania Supreme Court. The restatement is also discussed by the court and by the court in de Timo, and these are factors that the court may look to in making the decision of whether summary disposition is or is not appropriate. But in looking at those factors, that de Timo court, which didn't change Pennsylvania law at all, it just articulated some factors that a court may look to, and that court concluded that on the facts pleaded, a jury could reasonably differ as to whether defendants' conduct caused the harm, and therefore under settled Pennsylvania law, the issue was for the jury. Is there a distinction in the analysis between Honeywell and ADT? At this point in the case, Your Honor, remember we're at a very, very incipient stage of the case now. This was a motion to dismiss and a motion for judgment on the pleadings. So at this point, no. Honeywell made arguments which we... To what extent is it significant that you had specific discussions with an ADT sales representative about the specific concerns but no such discussions with Honeywell on these particular concerns? Well, Honeywell, so Honeywell is... Yes, so there's no question that the point person, the point corporation in negotiations with plaintiffs was ADT. ADT uses Honeywell's system. And what we have here, this failure to notify, as we also discussed, is many-layered. There is, we know that ADT received, at the time of the break-in, they received a signal that the service was interrupted. And again, going back to the approximate cause analysis, that wasn't followed up on throughout those hours. This wasn't some completed event. I think the defendant cited a case about when is a tort continuing. But that case deals with a, it's a interference of contact case where there's one event. Here is, the failure is ongoing. So would it ever end? Would approximate cause ever end under that matrix? I mean, here you have 15-plus hours and 20 minutes between the time of the entry and the homicide. What would be too far out? Your Honor, under these facts, where you have, as soon as Ms. Heeter is informed, finding out about this burglary the next day, she says, chat and here's how you find it. So I think that what you look at, and I think it's a jury question, and Your Honor's raising a jury question, one that shouldn't be decided as a matter of law here, when you have, the gap is not a gap in defendant's conduct. It's a gap in time. Defendant's failure is continuing. And had defendants, and what the facts pleaded show, is that had the defendants done what they promised to do at any time during that, and maybe cut it off an hour before, it may have been too late. But at any time before that, had they done what they promised to do, what was pleaded, what happened later, would have happened then. How she would have given this. So if the murder had taken place a week later, or two weeks later, are you making the same argument? I don't know if I would be making the same argument, because I don't know if the facts would possibly be the same in that situation, where you have her discover this murder and say, this was chat and here's how you find him. It's difficult for me to conceive how a lapse of a week, how all of these facts could be the same. But as we say in brief for a number of reasons, from our perspective, the 15 hours from the burglary to the murder helped the case. When did Ms. Heeter get notice after the, how soon after the burglary? Was she notified that there was a break in? Yes. So this was a, this was the Heeters, this was Ms. Heeter and her husband's vacation home. Brian lived in the area full time at the home. Brian's place. So they found out the next day when they drove up there, when they drove up to their normal Friday drive to the home. She's accessing the Android application on the way, which says no problem, everything's fine. And she gets there. And was it on Thursday or Friday that there was the break in? Thursday. And so the murder took place before she was even notified that there was a problem, is that correct? That's correct. Well before. So the murder took place late Thursday night. She and her husband drove up after work on Friday. So we're talking her, when they get there and discover, it's about, I think, maybe 36 hours or so after the murder. We've also discussed this in the votes poll section, when we talk about those particular, the team of factors that Your Honor was talking about, the courts can look to, to decide whether somebody's disposition is or is not necessary. The votes poll section to why the district court's analysis of those factors was flawed, factor by factor. And that's the same analysis that's repeated in the defendant's brief. And some of them we've discussed, we've already discussed, in terms of time, in terms of other contributing factors, when all of the factors cited by the court all had to do with the danger posed by Shatton, which was the exact reason for this alarm system in the first place for Ms. Heater to be immediately notified of that danger. But what, if anything, should we make of the fact that they had a, I'm not going to call it friendly, but a conversation about two hours before the murder? Yeah, I don't know on this record that anything can be made of that, except that, again, these are all matters to be considered by a jury, that we have somebody who's lethally armed that Brian doesn't know. One of the reasons he doesn't know is because he hasn't been alerted. So when the burglar is discovered and his mother gives the police information for capturing Shatton, she also is continually calling Brian to alert him. So he's unsuspecting. He doesn't know that this person is armed with the weapons he's just stolen from the family home. Does the mother tell the police that? Does the mother tell the police that this particular weapon is missing? I think he has it. I think there's a number of weapons, and I don't think that that's specifically treated, but I think that that is certainly inferred. They discover the whole burglary. They discover the cat that he shot and killed with one of those guns. They discover the missing rifles. And she says to the police, I think Shatton did this. Here's the kind of car he drives. Here's how you find him. What are the damages you're seeking to recover here? Let me be specific. Are you seeking any damages for the killing of the cat or loss of any personal property or anything like that, things that were taken from the house? No, Your Honor, no. This is solely dealing with the death of Mr. Harris. Yeah, and the injuries to his mother, yes. Okay. When she took out the, or had ADT come in, why didn't she tell them about the family gun collection? Repeat the question, Your Honor. Why didn't Ms. Heder tell the defendants about the family gun collection at her home or that she worried about a particular person who might try to harm her son? She did tell them she worried about a particular person who might harm her son. That's in the record. She told them that CJ Chatton, all the things that I started out with, that there were these dangerous characters she thought had left me, and she singled out Chatton. I thought she said she wasn't concerned about protecting any property inside the home. Meaning that she was concerned about, she was concerned because of the danger of Chatton. She was concerned about personal protection. What she meant is that she didn't want, she wasn't looking for this alarm system to protect her jewelry so much as to protect her family. Is there any evidence in the record as to what was the source of concern between her son and Chatton? What the complaint averts is that she knew about Chatton's torture past. For me to say anything more about that would be going beyond the record before the court. All right. We'll hear from the opposing counsel and then we'll get back on the record. Thank you. May I please have the court? The sole issue before this… Please state your name for the record. Charlie Ebelin for ADT, Your Honor. The sole issue before this court is the restatement 433 analysis that the district court undertook. And the district court in applying that three-factor test, which assesses whether or not proximate cause can be decided as a matter of law as being too remote. Also, the district court employed the correct lens. And this court in two cases in the last three years has applied that same test as a matter of law. Once very recently in the Tomlinson case, which assessed dismissal at this exact same stage on the pleadings. And in the very first paragraph of the court's opinion in that case, it did indeed say that proximate cause can be decided. It is often an issue of law because it incorporates ideas of public policy, of just how expansive tort liability can spread. Let's start back at the beginning. Is there any indication as to what caused the malfunction as to the break-in, why it wasn't noted at headquarters and then relayed to this year? Not at this point, Your Honor. To the extent that the district court analyzed the legal issue before it, it accepted all of the allegations against ADT as being true and treated them as such and appropriately applied the 12C standard to these facts. So all of the bad liability allegations, all of the allegations related to the formation of the contract and why the purchase occurred, the explanation behind those is, one, not material to the issues before the court, and two, was properly assumed as being proven for purposes of assessing the complaint. And that's not something at this stage that we've done investigation on, that I've done investigation on on behalf of ADT because the court very clearly in its order in walking through those factors pointed out what it was and wasn't assuming is true and also specifically in a footnote noted that all of the allegations, there's a lot of allegations made related to the formation of the transaction and that carried over into the briefing in this case before this court. The district court properly said those allegations, we'll assume them to be true, but they're not material to the 433 analysis.  and applied recent precedent from this court, recent precedent from Pennsylvania Superior Court and Pennsylvania Supreme Court to conclude that proximate cause in this instance, 15 hours later, separate location, there's two separate crimes that occur, it's just too remote under the facts of this case and under Restatement 433. What about Restatement 323? That's a good question. That's exactly where I was going. Okay. Restatement 323, particularly as used by the appellants in this case when they cite the Hamel decision. Oftentimes, Restatements 323 and 324 are analyzed to determine when a duty would attach based on increased risk of harm or detrimental reliance. There's a series of factors in each test. The Hamel decision, to the extent increased risk of harm in that case had some overlap to proximate causation. That was the medical malpractice case decided in 1978. The first paragraph of the Pennsylvania Supreme Court's analysis very clearly narrows its application to the medical malpractice context and since Hamel, which is where the plaintiffs or the appellants in this case are attempting to lift the 323 argument. Since Hamel, Hamel has not been expanded outside the medical malpractice context. In fact, the Tomlin case that I cited recently that this court decided in December of 2016 held that Hamel, even in the context of medical malpractice where there were some very strange facts, where one hospital had referred to another doctor doing some x-rays related to a potential cancer diagnosis. The fact back to the referring doctor and the treating physician got misplaced and there was an argument based on Hamel in that case. And this court said, in a footnote, that Hamel does not apply beyond its very narrow facts. So I think based on this court's decision in Tomlin, there is no basis to expand the Hamel analysis beyond its narrow context. I would add to that, as the court is aware, there is a waiver argument on any of the 323 and 324 arguments that have been raised for the first time on appeal. The basis for that is if you sift through the record below, the oral argument, the briefing below from the plaintiff, there is no reference to either of those restatement sections. There are no citations to the kind of cases that form their analysis around 323 or 324. And the waiver analysis, as this court knows, just asks if the district court had a fair opportunity to understand the legal arguments and issues. And when you haven't presented the sum of those arguments, when you haven't presented the legal authority, as is evident from even a cursory review of the pleadings before the district court, that creates a clear waiver. Again, before we add the law of proximate causation here, if the alarm system had worked as intended, the first question I think the other side would have is would Chatton have been stopped? In other words, had she known that there was a break-in, she would have hurried up there quickly, got there no more than a few hours later, and then discovered that there was a gun, that guns had been stolen. Then the question is did the alarm system's failure to notify Ms. Heater create a sequence of events or was it a substantial factor that put the son in danger? And the argument would be, of course, that there was Chatton's conscious disregard for the well-being of the son, whether that's a superseding cause. But it looks as if A does lead to B, does lead to C, does lead to D. That is that the break-in, the failure to report B, that Heater was not then alerted that Chatton was involved, C, and that Chatton ultimately kills Heater's son 15 hours later. The question is how do we deal with that? I think that description gets more to the idea of but-for causation, the other aspect, and not the policy determination that's inherent in proximate cause and the restatement factors which say ultimately it's the role of the court, as a matter of law, to create some policy limitations, much like the Pauluscraft case. You could say the same thing. The negligence of one of the attendees, had they not pulled her arm, maybe the man's arm, maybe the fireworks don't drop and the explosion doesn't occur. Can't we say if that didn't happen or they'd been more careful, then the chain of events never would have happened. And that's but-for causation. Had the antique rifle manufacturer never made that gun, it never would have been stolen and never would have been put to use. Can't we say A leads to B? It's the same analysis, and they're two different legal questions, and the district court in this case analyzed the legal question under precedent. But the restatement second does allow you to take into account whether the actor's conduct created a force or series of forces which are in continuous and active operation up to the time of the harm. So there is some type of but-for analysis that goes into play here. Then, of course, you take into account the lapse of time in addition. The argument is that 15 hours, when there was no notice at all within those 15 hours given to Ms. Heeter, in fact, no notice to her until she saw it herself the next day, then there's an argument that that should go to a jury. I think the issue on that second factor under 433, though, is the alarm system doesn't create the situation of peril. It's the first criminal act, and then you have another series of intervening acts, and then you have a conversation, and then you have, at some point, the formation of premeditation to commit an even more serious criminal act. The argument for the other side would be that there was a consideration paid for security, and the consideration paid for security, the alarm, the warning, did not work. Had it worked, she would have been on instant notice that there was a problem that she needed to get up there. Then she would have seen that the guns were stolen or had somebody else tell her very quickly. But that would have been well within even the 12 hours or so between the meeting, the break-in and the meeting of the Chattin and Heeter's son. I understand that argument. I think the proper application of that second factor, its verbiage, Your Honor, is that it relates to the creation of a hazard, and the creation of the hazard here is Mr. Chattin's criminal conduct, both the first criminal act and everything from there. That's not something that the alarm system did not put the wheels in motion for Mr. Chattin's ultimate decision to commit that second crime. That's the way that factor reads and has been applied in prior cases. What normally happens? Let's say you have a contract with my home, and there's a break-in. So there is some type of laser or whatnot that's tripped, and I get a call from usually the outfit, in this case in Canton, Ohio, very quickly. Is that what usually happens? If you have an alarm signal, that's what usually happens. Here what's being alleged is you have the alarm system's lines cut, the system totally disabled because the panel's ripped off the wall, so you have communication interrupted. So the issue here, and I think it's not alleged in the pleadings, and we didn't get that far and the court shouldn't get this far, but what's being alleged here is when all of that didn't happen, there was not a notice of a disconnection of communication between the alarm panel and the monitoring station. And I think that can depend based on what is in the customer's contract, what the alarm company's obligation is to do when there's a disconnect of communication from the panel to the company, because that's something that can occur if you've got storms that knock out power and cell towers. You might have your alarm system disconnected from communications with the tower. So typically that relates back to what the contract says with the customer. But isn't it usually if there's a storm, you have like a backup battery system that works? You can't, and the backup battery relates to whether it's got AC power, not whether it can communicate out. For instance, if you have phone lines down or cell power out of service, that's the communication pathway. That's totally different, but I've known in the past when we've lost electricity, we still have our alarm system works perfectly well. If it has a backup battery, that's true, and then you have the communication issue. Does this have a backup battery? What's that? This particular case? I assume it did. Most of them do, Your Honor. We'll hear from Ms. Lee, and we'll go from there. Good morning, Your Honors. Good morning. May it please the Court? I'm Jeanine Lee, appearing on behalf of Honeywell International, Inc. As is clear from your questions, Honeywell is in a different position than ADT with respect to these allegations. The allegations that plaintiff makes against Honeywell are extremely limited. They made unspecified components of the plaintiff's system, and there is only a product liability claim of defective design asserted against Honeywell. There are no allegations that Honeywell had any dealings whatsoever with plaintiff, made no representations to plaintiff, made no sale directly to plaintiff, did not select or install the components, and did not provide service to the residents. The claims of fraud, misrepresentation, negligent installation are not asserted against Honeywell. Even the claims of the performance of the equipment aren't directed against Honeywell, if you take a close read of plaintiff's complaint. Beyond these conclusory allegations of defect, the facts that she alleges indicate, in fact, the equipment functioned. She indicates that, in fact, ADT received a notice that there was an interruption of service, and they received that notice at or about the time of the break-in. The claims that she is asserting in the complaint concerning the failure to provide notice, the continuing duty, all relate to claims that she makes regarding promises that ADT made to her, and its monitoring of the equipment. So plaintiff's own factual content of her complaint removes Honeywell from the causal chain. Now plaintiff's argument here on appeal concerning Section 323 also is not applicable to Honeywell. We have the same arguments regarding the waiver of that claim as does ADT, and I echo those. But even if those claims were properly before this court, there isn't any support in Pennsylvania law to extend claims under Section 323 to a product manufacturer. The Pennsylvania case law under that section and the HAMO line of cases is actually very specific, generally to medical malpractice claims, but it's very specific to service providers. If someone had to provide a service of some sort, here the only claim against Honeywell is that it provided a product. And as I noted just a moment ago, in fact, the allegations about the product are that that product functioned and sent the signal of an interruption of service. So you're saying that the fault was only with the party, ADT? I'm not saying that there's any fault here, Your Honor. Was that the allegation? I think that, yes, in terms of the allegations of the complaint, that is correct. I think the district court's analysis as to substantial factor under Pennsylvania law was correct and applies with equal force to both defendants. However, I think there are some things specific to what the plaintiff has alleged in this case that just takes Honeywell even further out of the causal chain. Thank you. Thank you. Mr. Neroff. Thank you again, Your Honors. Just a few points, and I'm not sure if I'll get to all of them, but I think everything is covered in our briefs. So first, just the continuing irony here is that fundamentally ADT's argument, and it especially came out at the end of the argument, is blaming, is saying the proximate cause is a matter of law, is the criminal that this system was designed to alert plaintiffs against. That's the very reason for this system in the first place. The Tomlin case, this court's non-binding decision that counsel cited, the question decided by the court there was a threshold negligence question of whether the defendants caused the delayed diagnosis at all. It wasn't approximately, and the court even said, quote, not whether the delayed diagnosis proximately caused Tomlin's passing. So that case is completely an opposite, and this, the idea of a Your position is that the Section 323 analysis isn't limited to medical malpractice cases under Pennsylvania law. No, and as a matter of fact, again, in our brief, we go through a whole series of other kinds of cases that it's been applied to. There's a plaintiff coming to fire set by an intervening arsonist. That was the Ford case, Pennsylvania Supreme Court, which we also did discuss in the lower court and discuss at length in our brief here. Failure to provide an operative front door lock as promised, and there was an assault that occurred because of that. Product liability, preventing accessible electric current flow, alarm malfunction. This is, I'm sorry, on page 37, 38 of our brief. Pennsylvania law, including cases from this circuit, have applied increased risk of harm analysis in many different areas other than medical malpractice. And I assume my time is done, but in closing, I just would like to, again, stress that that cause under repeated Pennsylvania case law and cases from this court is a matter for the jury to determine unless the jury cannot reasonably differ. And as I think we've shown in our brief, that's not the case here. Thank you. I would ask that the three counsel would come up here.